Argued and submitted August 29, decision of Court of Appeals reversed;
judgment of circuit court affirmed September 7, 2006

Andrea R. MEYER
and David Fidanque,
*Respondents on Review,*

*v.*

Bill BRADBURY,
Secretary of State for the State of Oregon,
*Petitioner on Review,*

*and*

David E. DELK,
*Petitioner on Review.*

(CC 04C20669; CA A127935; SC S53693, SC S53840)
(Consolidated for Decision)

142 P3d 1031

Charles E. Fletcher, Assistant Attorney General, Salem, argued the cause for petitioner on review Bill Bradbury. With him on the briefs were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Philip Schradle, Special Counsel to the Attorney General.

Daniel W. Meek, Portland, argued the cause and filed the briefs for petitioner on review David E. Delk.

Charles F. Hinkle, Portland, argued the cause for respondents on review. With him on the briefs was ACLU Foundation of Oregon, Inc.

John DiLorenzo, Jr. and Gregory A. Chaimov, Portland, filed briefs on behalf of *amici curiae* Center To Protect Free Speech, Inc., and Fred VanNatta.

Thomas M. Christ, Portland, filed an *amicus curiae* brief.

DE MUNIZ, C. J.

Durham, J., dissented and filed an opinion.

## DE MUNIZ, C. J.

Plaintiffs brought this action to enjoin the Secretary of State from placing on the November 2006 general election ballot an initiative—Initiative Petition 8 (2006) (IP 8)—that would amend the Oregon Constitution to permit the state to regulate campaign contributions and expenditures. Plaintiffs asserted that, as proposed, the initiative contained two or more constitutional amendments that, under the separate-vote requirement set out in Article XVII, section 1, of the Oregon Constitution, must be voted on separately.[1] The trial court disagreed and granted summary judgment to both the Secretary of State and the initiative's chief petitioner (who had intervened as a defendant in the case). The Court of Appeals reversed that judgment, however, concluding that IP 8 did, indeed, violate the separate-vote requirement. *Meyer v. Bradbury*, 205 Or App 297, 134 P3d 1005 (2006). We allowed the petitions for review of the Secretary of State and the initiative's chief petitioner and now, for the reasons that follow, reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

We take the relevant facts from the Court of Appeals opinion:

"Defendant Delk, the chief petitioner for IP 8, gathered the requisite 25 elector signatures and submitted IP 8 to defendant Secretary of State for review. Defendant Secretary of State accepted comments on IP 8, including one from plaintiffs, who objected to IP 8 on the ground that it violates the separate-vote requirement of Article XVII, section 1. Defendant Secretary of State disagreed and engaged the Attorney General to draft a ballot title for IP 8. Defendant Secretary of State received no objections to the form of the ballot title and subsequently approved IP 8 for circulation.

"Plaintiffs then brought this action seeking declaratory and injunctive relief against defendant Secretary of State, again arguing that he should not have approved IP 8 for circulation, on the ground that it violates the separate-vote requirement. Defendant Delk intervened in the action and

---

[1] Article XVII, section 1, provides, in part:

"When two or more [constitutional] amendments shall be submitted in the manner aforesaid to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

raised several affirmative defenses, including lack of standing and failure to exhaust administrative remedies. Defendant Delk also joined defendant Secretary of State in asserting that IP 8 does not violate the separate-vote requirement of Article XVII, section 1. All parties agreed that there were no disputed issues of fact, and each moved for summary judgment. The trial court denied plaintiffs' motion, granted defendants', and entered judgment accordingly."

*Meyer*, 205 Or App at 300-01.

As noted, plaintiffs appealed that judgment. In the decision that followed, the Court of Appeals held that (1) under this court's decision in *Foster v. Clark*, 309 Or 464, 790 P2d 1 (1990), initiative challenges based on the separate-vote requirement properly could be brought before an election, *Meyer*, 205 Or App at 301-03; (2) plaintiffs possessed the necessary standing to bring their action, *id.* at 304; and (3) to the extent that plaintiffs were required to exhaust their administrative remedies before initiating their action, they had done so in this case. *Id.* at 306.

Turning to the merits, the Court of Appeals then examined the text of IP 8, the full text of which is as follows:

"Be it enacted by the People of the State of Oregon, there is added an Article II, Section 24, of the Constitution of Oregon, as follows:

"Notwithstanding any other provision of this Constitution, the people through the initiative process, or the Legislative Assembly by a three-fourths vote of both Houses, may enact and amend laws to prohibit or limit contributions and expenditures, of any type or description, to influence the outcome of any election."[2]

To determine whether IP 8 violated the separate-vote requirement of Article XVII, section 1, the Court of Appeals drew on this court's decision in *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998), inquiring under the paradigmatic phrase from that opinion "whether, if adopted, the proposal

---

[2] We note that, if IP 8 is approved by the voters, Article II of the Oregon Constitution will have two sections numbered 24.

would make two or more changes to the constitution that are substantive and that are not closely related." *Id.* at 277.

Ultimately, the Court of Appeals concluded that IP 8 proposed two or more substantive changes to the Oregon Constitution that were not closely related. To reach that conclusion, the Court of Appeals viewed IP 8 as two sets of proposed changes to the Oregon Constitution: one that would amend the right to freedom of expression set out in Article I, section 8, and one that would amend Article IV, section 25.[3] *Meyer*, 205 Or App at 308-09. The court found the first change easy to explain:

> "The first proposed change is straightforward. [The initiative] would create an exception to Article I, section 8, for 'laws to prohibit or limit contributions and expenditures, of any type or description, to influence the outcome of any election.' Under IP 8, both the people, through the initiative process, and the legislature may enact such laws."[4]

*Id.* at 308.

Respecting the second change, however, the court found the task more difficult:

> "The proposed change to Article IV, section 25, is more complicated *in that it would impact legislative power in several distinct ways.* IP 8 provides that 'the Legislative Assembly by a three-fourths vote of both Houses, may enact and amend laws to prohibit or limit contributions and expenditures, of any type or description, to influence the outcome of any election.' Thus, under IP 8, the legislature would be prohibited from passing such laws, except by a three-fourths majority. It would also be prohibited from amending any such legislation that it passed, except by a three-fourths majority. Finally, it would be prohibited from amending any such legislation that was adopted by the people through the initiative process, except by a three-fourths majority. As an example, under IP 8, the people could adopt

---

[3] The text of both Article I, section 8, and Article IV, section 25, are set out post, 341 Or at 297 nn 7, 8.

[4] In *Vannatta v. Keisling*, 324 Or 514, 931 P2d 770 (1997), this court held that Article I, section 8, prohibits laws restricting campaign expenditures and contributions.

legislation (by a simple majority under the initiative process) prohibiting campaign contributions, and the legislature would be powerless to amend that legislation, except by a three-fourths majority.

"We cannot say that the proposed change to Article IV, section 25—*which would have the profound effect of shifting the balance of power from the legislature to the people, through the initiative process, in matters related to campaign finance*—is closely related to the change carving out an exception to Article I, section 8, for laws that prohibit or limit contributions and expenditures to influence the outcome of an election. We therefore conclude that IP 8 violates the separate-vote requirement in Article XVII, section 1."

*Id.* at 308-09 (emphasis added). As a result, the Court of Appeals reversed the trial court's judgment. Both the Secretary of State and intervenor sought review of that decision, which we allowed.

On review, intervenor reiterates his position on several preliminary matters. Intervenor first argues, as he did before the Court of Appeals, that the preenactment status of IP 8 renders the controversy nonjusticiable and that plaintiffs lack standing to bring the present action because they failed to exhaust their administrative remedies. The Court of Appeals found both those arguments unavailing. For the reasons stated in the Court of Appeals opinion, we agree with that court's assessment of intervenor's arguments regarding justiciability and standing and decline to examine those particular issues further.[5]

The Secretary of State and intervenor also argue that the supermajority rule that IP 8 would add to Article IV, section 25, is not a substantive constitutional "change" in the same sense as this court used that term in *Armatta*. In addition, both the Secretary of State and intervenor argue, as

---

[5] We also note, in passing, that this court has indicated in the past its general concern over eleventh-hour challenges to proposed measures that have qualified for the ballot—a concern that led this court to fashion strict timelines for any such challenges. *See, e.g., State ex rel Keisling v. Norblad,* 317 Or 615, 860 P2d 241 (1993) (illustrating that principle). We do not suggest that such precedents should (or even might) be followed here. We only note their existence and trust to institutional memory that they will be raised when they appear to be pertinent.

they did below, that, if the potential for multiple constitutional changes is present in IP 8, then those changes are "closely related" as this court used that phrase in *Armatta* and therefore do not offend the Oregon Constitution's separate-vote requirement. In response, plaintiffs argue that, because IP 8 would change separate and unrelated provisions of the constitution in substantive ways, the Court of Appeals was correct in concluding that the proposed measure violates the separate-vote requirement. For the reasons that follow, we agree with the Secretary of State and intervenor that the changes proposed by IP 8 are "closely related" and do not offend the Article XVII, section 1, separate-vote requirement.

As noted, Article XVII, section 1, provides, in part:

"When two or more [constitutional] amendments shall be submitted in the manner aforesaid to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

In *Armatta*, this court characterized that provision as setting out a "separate-vote" requirement for constitutional amendments that focused "both upon the proposed change to the constitution, as well as the procedural form of submitted amendments." 327 Or at 274.

Nearly 30 jurisdictions have separate-vote provisions in their constitutions that are similar to Oregon's. Most of those jurisdictions have concluded that the provision should be interpreted similarly to the "single-subject" provisions set out in their respective state constitutions.[6] *See, e.g.,* *Californians For An Open Primary v. McPherson,* 38 Cal 4th 735, 763, 134 P3d 299 (2006) (stating principle). Some of those courts expressly interpret the single-subject provision "in an accommodating and lenient manner." *Id.* at 764. Having done so, they conclude that, like the single-subject requirement, their constitution's separate-vote provision:

---

[6] The single-subject requirement set out in Article IV, section 1(2)(d), of the Oregon Constitution provides:

"An initiative petition shall include the full text of the proposed law or amendment to the Constitution. A proposed law or amendment to the Constitution shall embrace one subject only and matters properly connected therewith."

"requires only a showing that the challenged provisions are reasonably germane to a common theme, purpose, or subject. The separate-vote provision does not impose a stricter standard requiring a showing of 'close' or 'functional' relatedness."

*Id.* at 777.

In Oregon, however, the separate-vote requirement found in Article XVII, section 1, has a different application and is driven by a decidedly different rationale. As this court interpreted that provision in *Armatta,* the separate-vote requirement serves as a safeguard that is fundamental to the concept of a constitution. 327 Or at 276. In reaching that conclusion, this court did not perceive any reason to elaborate on why or how the concept of a constitution was important; instead, it noted only that the act of amending a state's organic law differs significantly from enacting or amending legislation. *Id.*

What the court only implied in that passage in *Armatta,* however, it has made explicit elsewhere. For example, this court observed in *State v. Stoneman,* 323 Or 536, 542, 920 P2d 535 (1996):

"It is axiomatic that, among the various interests that the government of this state seeks to protect and promote, *the interests represented by the state constitution are paramount to legislative ones.*"

(Emphasis added.) In our view, that hierarchy of law always must be acknowledged and respected. Consistently with that view, this court expressly has held that Oregon's separate-vote provision—which applies to only constitutional amendments—imposes a narrower requirement on the act of amending the constitution than does its counterpart, the single-subject rule, which applies equally to statutory as well as constitutional measures. *Armatta,* 327 Or at 276. To implement that narrower requirement, we do not search simply for a unifying thread to create a common theme, thought, or purpose from a melange of proposed constitutional changes. Instead, we inquire whether, if adopted, a proposal would make two or more changes to the constitution that are substantive and are not closely related. If so, the proposal violates the separate-vote requirement of Article XVII, section 1,

because it would prevent voters from expressing their opinions as to each proposed change separately. *Id.* at 277. We turn now to that inquiry respecting IP 8.

As a threshold matter, a separate-vote analysis must focus on the *"particular changes made to the constitution." Swett v. Bradbury*, 333 Or 597, 609, 43 P3d 1094 (2002) (emphasis in original). In keeping with that rule, we begin any separate-vote inquiry by identifying the changes, both explicit and implicit, that a proposed measure purports to make to the Oregon Constitution. *Id.* at 606. If there are multiple changes we determine whether they are "substantive." If they are, then we must then determine whether they are closely related. *Id.*

In this case, the Court of Appeals concluded that IP 8 proposes at least two changes to the Oregon Constitution, one aimed at the free expression provisions of Article I, section 8,[7] and one aimed at the legislative majority provisions of Article IV, section 25.[8] *Meyer*, 205 Or App at 307. We agree with that general assessment, as far as it goes. To be precise, however, the changes proposed by IP 8 would, in fact, alter at least three existing constitutional provisions. If enacted, IP 8 would, indeed, implicitly amend the aforementioned sections of Article I and Article IV. By its own terms, however, IP 8 also would explicitly add a new section to Article II—a new section whose distinct provisions, standing alone, still could be susceptible to a separate-vote inquiry, even if the implicitly affected provisions of Article I and Article IV did not exist.

---

[7] Article I, section 8, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[8] Article IV, section 25, provides:

"(1) Except as otherwise provided in subsection (2) of this section, a majority of all the members elected to each House shall be necessary to pass every bill or Joint resolution.

"(2) Three-fifths of all members elected to each House shall be necessary to pass bills for raising revenue.

"(3) All bills, and Joint resolutions passed, shall be signed by the presiding officers of the respective houses."

■    We also agree with the Court of Appeals that the changes at issue here are "substantive." Although this court's cases have yet to define that term as it was used in *Armatta*, the word nevertheless possesses a well-understood legal meaning, *viz.*, "An essential part or constituent or relating to what is essential." *Black's Law Dictionary* 1429 (6th ed 1990). This court's decisions since *Armatta* have applied that meaning when conducting separate-vote inquiries. *See, e.g.*, *League of Oregon Cities v. State of Oregon*, 334 Or 645, 673-74, 56 P3d 892 (2002) (change to requirements for payment of just compensation to property owners and change respecting laws restraining expression were two substantive constitutional changes); *Lehman v. Bradbury*, 333 Or 231, 244, 37 P3d 989 (2002) (changes in term limits for state executive officers and creation of such limits for state legislators and members of Congress were two substantive constitutional changes). And, viewed in that light, the potential changes at issue here—that is, an express change to Article II and implied changes to Article I, section 8, and Article IV, section 25—are substantive ones.

Thus far, our analysis and that of the Court of Appeals parallel each other. However, we begin to part company with the Court of Appeals when our inquiry turns to whether the potential changes in this case are closely related. In addressing that question, the Court of Appeals noted that the proposed change to Article IV, section 25, encompassed in IP 8 would "impact legislative power in several distinct ways," *Meyer*, 205 Or App at 308. Most significantly (in that court's view), was the proposed measure's imposition of a three-quarter majority (supermajority) requirement on the legislature to enact or amend laws regulating campaign contributions and expenditures. *Id.* In the face of such a requirement, the Court of Appeals opined, a simple majority of the people could pass a citizen-backed initiative prohibiting all campaign contributions, while the legislature would be "powerless to amend that legislation, except by a three-fourths majority." *Id.* at 309. As noted, the Court of Appeals reasoned that the upshot of that change would shift the balance of lawmaking power from the legislature to the people in matters relating to campaign contributions and expenditures. *Id.* And that shift of power, the Court of Appeals concluded, could not

be reconciled as closely related to the changes that IP 8 would make to the guarantee of free expression contained in Article I, section 8. *Id.*

■■ In our view, however, several aspects of that reasoning are problematic. First, the particular "legislative power" that the Court of Appeals invoked in its opinion—*i.e.*, the power to regulate campaign contributions and expenditures—is illusory; it does not presently exist. Since the inception of the Oregon Constitution, Article I, section 8, strictly has prohibited any legislation "restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever[.]" Under Oregon law, both campaign contributions and expenditures are forms of expression protected by that constitutional provision, thus making legislatively imposed limitations on individual political campaign contributions and expenditures impermissible. *See Vannatta v. Keisling*, 324 Or 514, 524, 931 P2d 770 (1997) (so holding). Consequently, it is difficult, from both a legal and logical perspective, to postulate a "shift" of power from one entity to another within the legislative branch, particularly when the power at issue never has existed at all, much less resided with either entity.

■ Second, even if the ability to enact campaign contribution and expenditure laws were a legal reality, describing the prospective changes to Article IV, section 25, as "shifting the balance of power from the legislature to the people" misapprehends the unitary nature of the legislative power in Oregon. Although two distinct entities may, indeed, enact laws in this state, the source of *all* legislative power is the people, and that power is exercised through a single legislative department. As this court put the matter long ago:

> "By the adoption of the initiative and referendum into our constitution, the legislative department of the State is divided into two separate and distinct lawmaking bodies. *There remains, however, as formerly, but one legislative department of the State. It operates, it is true, differently than before - one method by the enactment of laws directly, through that source of all legislative power, the people; and the other, as formerly, by their representatives*[.]"

*Straw v. Harris*, 54 Or 424, 430-31, 103 P 777 (1909) (emphasis added). As a result, although two lawmaking bodies—the legislature and the people—exist, their "exercise of the legislative powers are coequal and co-ordinate." *State ex rel. Carson v. Kozer*, 126 Or 641, 644, 270 P 513 (1928); *see also MacPherson v. DAS*, 340 Or 117, 126, 130 P3d 308 (2006) ("In Oregon, the Legislative Assembly and the people, acting through the initiative or referendum processes, share in exercising legislative power."). To conclude that the legislative power can be "shifted" within a discrete area of lawmaking so as to render it out of balance with itself ignores the unitary nature of that power. It creates, we think, a flaw that undermines both the Court of Appeals' separate-vote analysis in this case and its ultimate conclusion.

The Court of Appeals observed that this court has offered little guidance concerning what it means for provisions to be "closely related" under the separate-vote analysis, other than applying that criterion in a handful of cases. *See Meyer*, 205 Or App at 308 n 5 (so stating). But, if this court has written little on the subject, it is because there have been few instances in which the constitutional changes before the court presented a close question on that issue. In some cases, this court has needed to focus on only the different parts of the constitution being amended to conclude that the changes at issue were clearly unrelated, because they involved different changes to different fundamental rights affecting different groups of people. *See, e.g., League of Oregon Cities*, 334 Or at 674-75 (amendments contained in single constitutional measure expanded Article I, section 18, property rights for some property owners, while simultaneously limiting Article I, section 8, free expression rights for other property owners). In other cases, this court focused on the different provisions contained in the amendatory measure itself and concluded that the changes that they would have made to the constitution were themselves so divergent as to render them "not closely related." *See, e.g., Swett*, 333 Or at 597 (invalidating measure that encompassed adding constitutional campaign contribution disclosure requirement, as well as constitutional requirement that signature gatherers for initiative petitions be registered to vote in Oregon).

In our view, however, the case before us now is different from either of those examples. First, IP 8 does not change different constitutional provisions that confer different fundamental rights on different groups of persons. *See Armatta*, 327 Or at 283-84 (changes to constitutional provisions involving separate constitutional rights granted to different persons not closely related for separate-vote requirement); *see also Lehman*, 333 Or at 246 n 9 (when separate constitutional provisions conferring separate rights on different groups are affected by proposed amendment, it is "strong indication" that provisions not closely related for separate-vote requirement).

Second, IP 8 is not a complicated measure. If adopted, IP 8 will do essentially two things: (1) create a general authority for both the people and the legislature to enact laws regulating campaign finances; but (2) condition the legislature's ability in that regard through a supermajority procedural requirement. The supermajority requirement that IP 8 would place on the legislature both carries out and limits the general authority to enact contribution and expenditure laws that the measure would create. In other words, the supermajority requirement is a procedural condition on which the right to exercise substantive authority is predicated. Viewed in that manner, the constitutional changes proposed by IP 8 are "closely related" and therefore do not offend the Article XVII, section 1, separate-vote requirement.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**DURHAM, J.**, dissenting.

The Court of Appeals concluded that Initiative Petition 8 (2006) (IP 8) contained two or more amendments to the Oregon Constitution that must be submitted to and voted on separately by the voters as Article XVII, section 1, of the Oregon Constitution requires. I agree with that conclusion and, consequently, I respectfully dissent from the majority's decision to reverse the Court of Appeals.

The majority concludes that "the changes proposed by IP 8 would, in fact, alter at least three existing constitutional provisions." 341 Or at 297. The majority also notes that each of those changes are substantive ones and that the state intends to submit each of those constitutional amendments together for a single vote in the context of IP 8. I agree with each of those conclusions.[1]

If we pause the legal analysis of this case at that point, it appears beyond question that IP 8 violates the unambiguous terms of Article XVII, section 1, which provides, in part:

"When two or more [constitutional] amendments shall be submitted in the manner aforesaid to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

The purpose that underlies that provision is clear. The drafters of Article XVII, section 1, intended to preclude use of the practice known as "logrolling," in which initiative drafters might join more than one constitutional amendment in a single initiative petition in order to secure sufficient affirmative votes for the entire package. The constitutional drafters chose to require the submission of each proposed constitutional amendment for a separate vote by the voters. That policy choice insures that the voters' voice will be expressed in clear terms as to each proposed constitutional amendment. If we evaluate IP 8 under the unambiguous terms of Article XVII, section 1, it is difficult to conceive of a clearer violation of that constitutional requirement.

The majority, however, does not pause in its analysis at that point but proceeds to consider whether the multiple constitutional amendments contained in IP 8 are "closely related." The phrase "closely related" does not appear in Article XVII, section 1, or in any other provision of the Oregon Constitution.

---

[1] I also join in the majority's conclusions that sustained the Court of Appeals' rulings on the availability of a preelection challenge in this context and plaintiff's satisfaction of any applicable requirements regarding their standing to bring this action and their exhaustion of any applicable administrative remedies.

The parties to this case and the Court of Appeals have observed, correctly, that this court created the phrase "closely related" in case law that applied Article XVII, section 1, but that this court has never explained what that phrase meant. That is a fair criticism. As the majority acknowledges, this court's cases have announced little more than conclusions that various proposed measures were not closely related and, therefore, ran afoul of Article XVII, section 1.[2]

The majority purports to answer that criticism here by offering the following conclusions about IP 8. First, "IP 8 does not change different constitutional provisions that confer different fundamental rights on different groups of persons." *Id.* at 301. Second, "the supermajority requirement is a procedural condition on which the right to exercise substantive authority is predicated." *Id.* at 301.

I do not quarrel necessarily with the accuracy of those statements about IP 8. However, they do not convince me that IP 8 satisfies Article XVII, section 1. The majority's first conclusion introduces criteria that water down the clear terms of Article XVII, section 1, to the point that those terms are unrecognizable. The majority's second conclusion simply matches one subjective conclusion "closely related"—to another equally undefined conclusion—the term "procedural."[3] In my view, calling IP 8 a mere "procedural" change to the legislature's constitutional mode of operation does not explain why the relationship between the two amendments is "close" and simply trivializes the significant change to the existing requirements for legislative action that IP 8 embodies.

I emphasize that I cannot tangibly demonstrate that my dissenting view is legally correct and that the majority opinion is legally erroneous, because the governing criterion under discussion—"closely related"—invites little more than

---

[2] The majority criticizes the Court of Appeals' reasoning with respect to that court's apprehension about the tendency of IP 8 to shift legislative power between the state legislature and the voters exercising the power of initiative. I agree with that criticism. However, that criticism by the majority does not answer the Court of Appeals' broader conclusion that IP 8 contains multiple amendments and violates Article XVII, section 1.

[3] The majority also labels both amendments as "substantive" elsewhere in its opinion. *Id.* at 298.

a subjective opinion about the existence of more than one amendment in a proposed initiative amendment to the constitution. Subjective opinions by judges are not what Article XVII, section 1, calls for. For me, the paradigm is and should remain the clear terms of Article XVII, section 1, not an elastic, adjectival modifier that, in truth, merely invites judges to render subjective conclusions about constitutional requirements.

This court, in my view, intended the phrase "closely related" to explain why a proposed alteration of more than one phrase or clause of a constitutional provision nevertheless constituted a single amendment. The court's goal in using that phrase was to implement Article XVII, section 1, not to undermine or alter the clear terms of that provision.

The unfortunate consequence of today's decision is to shift the focus of the single vote inquiry away from the clear terms of Article XVII, section 1, to a court-created adjectival phrase that is, in effect, standardless. That shift will induce initiative drafters to combine multiple constitutional amendments in a way that purports to create some relationship— perhaps a close one—between separate proposed constitutional amendments. The proper focus, in the words of Article XVII, section 1, should be on the presence of more than one constitutional amendment, not on whether multiple amendments stand in some relationship to each other and, if so, whether that relationship, in the subjective opinion of judges, is "close."

All parties concede that IP 8 modifies Oregon's free speech provision, Article I, section 8. As the majority correctly concludes, IP 8 also changes Article IV, section 25, which provides, in part, that "*a majority* of all the members elected to each House *shall be necessary to pass every bill or Joint resolution.*" (Emphasis added.) It would do so by substituting a supermajority vote requirement for the existing majority vote requirement for the adoption or amendment of laws restricting campaign contributions and expenditures.

Those proposed changes do bear some relationship to each other, in that they each concern the financing of political campaigns in Oregon. But the issues that those proposed amendments raise are quite distinct. It is easy to imagine

that some voters may desire to authorize the legislature to regulate campaign contributions and expenditures, but object to the creation of a supermajority voting requirement for the legislature that necessarily will grant a legislative veto power to a small political minority.

I cannot conclude that there is a "close" relationship between two separate constitutional amendments, one that would alter a significant aspect of the free speech guarantee to all citizens in Oregon's Bill of Rights, and one that would modify the constitutional voting requirements that now govern each house of the Oregon Legislature. The combination of those distinct constitutional amendments for a single vote by the electorate invites the very evil—logrolling—that the drafters of Article XVII, section 1, intended to prevent.

The Court of Appeals correctly concluded that IP 8 violates the separate-vote requirement in Article XVII, section 1.[4] The majority errs in overturning that conclusion. Therefore, I respectfully dissent.

---

[4] The majority also refers in a footnote to the court's creation in a past case of a timeline for a late challenge to a proposed measure. *Id.* at 294 n 5. The majority appears to assert that this case raises no issue regarding the timeliness of plaintiffs' challenge. I agree and, therefore, see no purpose in discussing that case law or in inviting litigation of timeliness questions that may arise in other cases. For me, the question of what rules should govern the timely filing of litigation pertaining to an election is a matter for the legislature.